NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Criminal No.: 05-249 (JLL) |
| v. | : | |
| | : | **OPINION** |
| RICHARD STADTMAUER, | : | |
| | : | |
| Defendant. | : | |
| | : | |

For the Government: Rachel A. Honig and Thomas J. Eicher

For the Defense: Robert S. Fink, David M. Zinn, and Megan Brackney

**LINARES, District Judge.**

Presently before this Court is the sentencing of Defendant Richard Stadtmauer.  Prior to sentencing both parties submitted memorandums in support of their positions, totaling 168 pages not including exhibits, declarations, and letters.  Because of the size of the record and submissions and because of the complexity of the issues involved, this Court bifurcated Mr. Stadtmauer's sentencing, hearing argument on the applicable sentencing range under the United States Sentencing Guidelines ("USSG" or "Guidelines") on February 3, 2009.[1]  This Court has considered the record in this case, the parties' submissions, the arguments at the February 3rd hearing, and the presentence report ("PSR") prepared by the U.S. Probation Office.  For the reasons set forth below, this Court finds that the appropriate USSG sentencing range for Mr. Stadtmauer is 46-57 months, based on an offense level of 23 and a criminal history category of I.

---

[1]The version of the USSG effective November 1, 2008 applies in this case.

Mr. Stadtmauer was charged with one count of conspiracy under 18 U.S.C. § 371 and seventeen counts of aiding and assisting in the filing of materially false tax returns under 26 U.S.C. § 7206(2). These charges stemmed from Mr. Stadtmauer's activities with the Kushner Companies, a group of commercial real estate partnerships. The Government alleged that Mr. Stadtmauer conspired with other partners and employees to file false tax returns for numerous of the Kushner partnerships. After a two month trial before this Court, Mr. Stadtmauer was convicted by a jury on the conspiracy count and eight counts of aiding and assisting in the filing of materially false tax returns; he was acquitted of the nine other counts.

## I.    BASE OFFENSE LEVEL CALCULATION

The base offense level under the Guidelines for tax offenses is determined by the amount of tax loss as defined in § 2T1.1.[2] See also United States v. Gricco, 277 F.3d 339, 355 (3d Cir. 2002). Pursuant to § 2T1.1(c)(1), "[i]f the offense involved tax evasion or a fraudulent or false return, statement, or other document, the tax loss is the amount of loss that was the object of the offense (i.e., the loss that would have resulted had the offense been successfully completed)." Note B to this subsection further provides that "[i]f the offense involved improperly claiming a deduction or an exemption, the tax loss shall be treated as equal to 28% of the amount of the improperly claimed deduction or exemption . . . plus 100% of any false credits claimed against tax, unless a more accurate determination of the tax loss can be made."

In this case, a determination of a specific amount of improper deductions and the corresponding amount of tax loss was not an element of the offenses charged. The jury was

---

[2] The base offense level for violations of 26 U.S.C. § 7206(2) are governed by § 2T1.4; violations of 18 U.S.C. § 371 are governed by § 2T1.9. However, under both of these sections, tax loss is determined by reference to § 2T1.1.

instructed that

> Whether the Government has or has not suffered a pecuniary or monetary loss as a result of the alleged false return is not an element of the offense.
> In proving that the defendant violated 7206(2) by aiding and assisting in the preparation of a false return, the Government does not have to prove the exact amount of the allegedly false deduction from income. It is sufficient for the Government to show that deductions were knowingly and willfully misstated, and that these false statements were material . . . .

(Trial Tr. 30.69.) Thus, the jury was not asked to make any specific findings as to the amount of improper or false deductions. Rather, the evidence presented at trial by the Government merely "attempt[ed] to quantify [the] amounts [of false deductions] in summary fashion for the jury's benefit." (Sentencing Mem. of the United States, at 8 [hereinafter "Gov't Mem."].) Therefore, these amounts now must be determined by this Court.

As the Government acknowledged in its reply memorandum, at sentencing it has the burden of proving the amount of improperly claimed or false deductions by a preponderance of the evidence. See also United States v. Berry, No. 07-1251, 2009 U.S. App. LEXIS 32, at * 15 (3d Cir. Jan. 6, 2009). Once a number of false deductions has been proven by a preponderance of the evidence, this Court then must determine whether the 28% presumptive rate from § 2T1.1(c), Note B, should be used for calculating the tax loss or whether some other more accurate determination of tax loss can be made.

### A.      Preliminary Arguments

Before turning to the evidence related to the alleged improper deductions, this Court will address two of Mr. Stadtmauer's alternative tax loss arguments: (1) that the plea stipulations of other defendants set a maximum amount of tax loss that should be attributed to Mr. Stadtmauer, or, alternatively, (2) that the civil audit of Charles Kushner sets a maximum amount of tax loss.

The Government asserts that the tax loss attributable to Mr. Stadtmauer is $1,772,832. In plea agreements with some of the other defendants in this case, specifically Marci Plotkin, Stanley Bekritsky, and Scott Zecher, the Government stipulated that the loss attributable to each of them was between $80,000 and $200,000.[3]  Mr. Stadtmauer argues that there is no basis for attributing more tax loss to him than these defendants.  Furthermore, Mr. Stadtmauer argues that these stipulations bind the Government from arguing for a higher amount of tax loss.  In support of his position, he cites to United States v. Telesco, 962 F.2d 165 (2d Cir. 1992).  Mr. Stadtmauer notes that in Telesco, the Second Circuit Court of Appeals stated that

> [p]rosecutors should be aware that, in entering into such stipulations, they may not
> compromise on factual issues when they have a good faith disagreement with the
> defense.  Nor should they sign a stipulation unless they have a good faith belief that
> the evidence supports the facts stated in the stipulation.  Otherwise, the disparities in
> the sentencing for similar crimes that the Guidelines were designed to reduce will be
> covertly reintroduced into the federal criminal judicial system.

Id. at 168.  However, despite this admonition to the prosecutor, the court held that under the Guidelines the judge was obligated to consider all relevant facts before him, and was not limited to the stipulation.  Id. (quoting USSG § 6B1.4(d)).  The commentary to § 6B1.4(d) states that "in determining the factual basis for the sentence, the court will consider the stipulation, together with the results of the presentence investigation, and any other relevant information."  Thus, given that a stipulation does not even bind a court when sentencing a defendant who was a party to a stipulation, this Court does not find itself bound by stipulations pertaining to other defendants. Mr. Fink, attorney for Mr. Stadtmauer, conceded as much at the sentencing hearing.  Here, aside from any arguments that the Government now makes for sentencing, this Court

---

[3] Mr. Kushner stipulated in his plea to a tax loss of between $200,000 and $325,000. Anne Amici stipulated in her plea to a tax loss of between $30,000 and $80,000.

presided over the trial, is very familiar with the issues and evidence presented, and is obligated to consider all relevant information. This does not mean that these prior stipulations are wholly irrelevant for sentencing purposes; they may be relevant to the ultimate determination of an appropriate sentence, but they are not relevant to the determination of tax loss.

Mr. Stadtmauer also argues that the civil tax settlement of Charles Kushner should set the maximum amount of tax loss for him. In November 2007, as a condition of his plea agreement, Charles Kushner reached an agreement with the Internal Revenue Service ("IRS"), settling his tax deficiencies. As part of the settlement, he agreed to recognize $1,019,215 of additional income (representing false partnership deductions). This settlement "treat[ed] Charles Kushner as though he was the 100% owner of all the partnerships at issue, and . . . 100% of the partnerships' disallowed deductions were treated as though they flowed through to Charles Kushner's individual income tax returns." (Decs. in Supp. of Richard Stadtmauer's Presentence Mem. Concerning the Sentencing Guidelines [hereinafter "Def.'s Decs."], Ex. C., Dec. of Matthew Magnone, at ¶ 13.) Mr. Kushner paid $119,595 as part of the settlement. (Richard Stadtmauer's Presentence Mem. Concerning the Sentencing Guidelines, at 7 [hereinafter "Def.'s Mem."].) Mr. Stadtmauer argues that, because Mr. Kushner's audit settled the tax delinquencies of all partners, the amount he paid to the IRS, $119,595, represents the actual loss to the Government for all of the false deductions in this case. Although couched in different terms, this argument is essentially the same as his argument regarding the plea stipulations. This Court finds that it has no more merit with regard to binding this Court to an amount of total tax loss. It is clear from the record that the amount of false deductions considered for purposes of the audit only represented a portion of the improper deductions alleged here. The IRS only considered a

portion of the improper charitable deductions and made no adjustments related to capital/depreciable items, non-property deductions, or gifts and entertainment expenses. Therefore, this Court rejects this argument.

**B.     Amount of Improper or False Deductions**

Based on Agent Grant's charts compiled for the trial, the Government alleges that the amount of improper or false deductions that it has proven is $6,331,539. This number is broken out by the Government as follows:

| | |
|---|---|
| Capital/Depreciable Items | $4,106,237 |
| Less: Depreciation Allowed | (689,619) |
| Net Capital/Depreciable Items | $3,416,618 |
| Additional Distributions | $1,144,140 |
| Contributions to Office Expense | $1,497,149 |
| Gifts & Entertainment Expense (50%) | $273,632 |
| **Total Alleged Improper Deductions** | **$6,331,539**[4] |

Mr. Stadtmauer's position is that Agent Grant's numbers are unreliable and incorrect, and that, therefore, the Government has not met its burden of proving its alleged amount, or any specific amount, of improper deductions by a preponderance of the evidence. The Government asserts that "[f]or each item included on Agent Grant's chart, there is sufficient evidence in the record

---

[4] The Court notes that the alleged amount of improper deductions set forth in the PSR differs from the Government number. However, the difference in improper deductions does not affect the recommended base offense level; both the Government and PSR begin with a base offense level of 22 based on a tax loss of between $1,000,000 and $2,500,000. Additionally, because this Court has engaged in its own detailed analysis of the alleged improper deductions, any discrepancy between the Government and the PSR does not affect this Court's tax loss analysis.

[from the trial] to prove by a preponderance of the evidence that it was improperly deducted."

(Reply Mem. of the U.S. Regarding Sentencing, at 19 [hereinafter "Gov't Rep."].)  Nevertheless, Agent Grant's testimony and the Government's own statements seem to undermine this statement.  The following are a couple of excerpts from Agent Grant's testimony at trial.

> [Gov't]: Did you prepare separate charts for non-property related items?
> [Agent Grant]: Yes I did.
> [Gov't]: Is this expense reflected on those charts?
> [Agent Grant]: No, it is not.
> [Gov't]: Why not?
> [Agent Grant]: I had provided schedules in this case in January and *didn't feel that I wanted to change them*, to move things around.  I thought it would delay things.
> [Gov't]: If an expense that you later determined was non-property related, it nevertheless is included on this chart, is that more or less favorable to the taxpayer?
> [Agent Grant]: More favorable to the taxpayer.
> (Trial Tr. 24.104-05 (emphasis added).)
> * * *
> [Gov't]: Are there some entries on your gift and entertainment chart . . . that you believed were deductible in an amount less than 50%?
> [Agent Grant]: Yes.
> [Gov't]: Why did you nevertheless include them on this chart?
> [Agent Grant]: Basically, I did not want to change the charts.  I left them in.  It is to the benefit of the taxpayer at this point, so I left the expenses in.
> (Trial Tr. 24.131)
> * * *
> [Gov't]: Why did you apply the 50-percent limitation rather than something that would be less favorable to the taxpayer?
> [Agent Grant]: I felt that that was appropriate in the manner there might be some expenses in the American Express *that might be fully deductible*, and therefore allowing other expenses at more than that their allowance would compensate for that.
> (Trial Tr. 24.132 (emphasis added).)

These are just a couple of the examples from Agent Grant's testimony that Mr. Stadtmauer points to when asserting that her charts are unreliable, inaccurate, and in many instances wrong.  In its reply brief, the Government responds that "[o]bviously, . . . [choosing to not update the charts] was only done because to keep the charts unchanged and allow a . . . deduction for the items was

*favorable* to the defendant; any failure of 'accuracy' was entirely to his benefit, and intentionally so." (Gov't Rep., at 20 (emphasis in the original).)  While this Court does not doubt the integrity of the Government or its expert, it also recognizes that both are self-interested and that statements asserting that the Government's numbers are more favorable to Mr. Stadtmauer, even if not wholly accurate, must be considered in this light.

This was not an issue at trial, where proving a specific amount of improper deductions was not required, as discussed above.  However, now at the sentencing phase, the Government bears the burden of proving an amount of improper deductions by a preponderance of the evidence.  The Government has taken the position that the evidence presented at trial proved the entire amount of alleged improper deductions by a preponderance of the evidence, it chose to rest on that record for sentencing.  However, this approach creates a problem for the Court.  The problem is that, although it is absolutely clear from the trial testimony, record, and verdicts when taken together that some significant amount alleged by the Government represents improper deductions, it is equally clear that the Government's numbers are not wholly accurate.  Thus, this Court was required to go through the record, category by category, in order to determine what portion of the Government's number has adequately been proven by a preponderance of the evidence.

Before this Court turns to the evidence related to each category, the Court will first address Mr. Stadtmauer's argument that, as a general matter, any alleged improper deductions related to the counts for which he was acquitted should not be included in the tax loss calculation.  "[A] jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by

a preponderance of the evidence." <u>United States v. Watts</u>, 519 U.S. 148, 157 (1997); <u>see also</u>

<u>Berry</u>, 2009 U.S. App. LEXIS 32, at * 19.  Additionally, under the Guidelines, all relevant

conduct as defined in USSG § 1B1.3(a), not simply conduct related to convictions, is considered

in determining the base offense level.  <u>See</u> <u>Gricco</u>, 277 F.3d at 356.  Therefore, the acquittals of

Mr. Stadtmauer on some of the offenses do not necessarily operate to exclude amounts related to

those charges.  The Court, therefore, finds that it is proper to review the evidence related to all

partnerships in determining whether or not the Government has met its burden.

  Additionally, underlying all of Mr. Stadtmauer's attorney's arguments is the idea that the

determination of deductions is always, or at least with respect to all the types of deductions in

this case, a detailed, fact-specific exercise.  Thus, he argues that evidence that Agent Grant's

methodology lacked a probing inquiry in all cases is enough to find that none of her findings

satisfy the Government's burden of proof.  (<u>See</u> Def.'s Mem., at 65.)  This Court disagrees.

While it is necessary for the Government to prove an amount of deductions by a preponderance

of the evidence, this Court finds, based on its knowledge of the issues and evidence, that all

deductions are not created equal, some do speak for themselves, others do not.  Thus, the

quantum of evidence necessary to satisfy this Court that a deduction is more likely than not

improper may be different for different types of deductions.  With this background, the Court

will now turn to the specific categories of deductions.

  1.   <u>Capital/Depreciable Items</u>

  For purposes of determining the amount of improper deductions related to the capital and

depreciable items, the Court will use as a starting point the Government's number, from Agent

Grant's charts, of $4,106,237.  Any depreciation offset, if appropriate, is relevant to the

discussion of tax loss and is, therefore, dealt with below. Throughout the trial and in the parties' submissions, arguments related to the items in this category can generally be broken into two categories: purchases of new assets and building improvements. The Court asked the Government to break its total capital/depreciable items number down into these two categories. The Government asserts that of the $4,106,237, $1,926,029 represents new asset purchases and $2,180,121 represents building improvements. Mr. Stadtmauer asserts that his review of Agent Grant's charts shows that $1,862,036 represents new asset purchases and $2,244,201 represents building improvements. Thus, both parties agree that the number related to new asset purchases is at least $1,862,036 and no more than $1,926,029, and that the number related to building improvements is at least $2,180,121 and no more than $2,244,201. Regardless of which numbers are used, the outcome is the same. Thus, for the sake of simplicity, the Court will use Mr. Stadtmauer's numbers.

a)      *New Asset Purchases*

Mr. Stadtmauer has two primary arguments related to these deductions: (1) his general argument that Agent Grant's numbers are unreliable because she did not engage in an adequate level of inquiry, and (2) that the majority of items in this category were properly deducted under the de minimus rule. The Government argues that a detailed inquiry is not required for these types of assets–new trucks, appliances, and the like–arguing that such expenses are easily identifiable and once identified the tax treatment is straight forward. As to these types of assets, the Court agrees. This is one area where the Court finds that the records do speak for themselves–e.g. an invoice for a new refrigerator is clear. Additionally, the evidence showed that the partnerships always deducted these types of expenses in full. For example, Mr. Fink stated,

during cross-examination of Agent Grant:

> [Mr. Fink] Are you aware that, in fact, the Schonbraun firm expensed all appliances
> of the Kushner Companies if they were under $1,000?
> [Agent Grant] They expensed all of them. . . .

(Trial Tr. 25.108.)

This Court addressed Mr. Stadtmauer's arguments related to the de minimus rule and its

application to the facts of this case in its September Opinion, finding it not applicable.  This

Court wrote:

> [Mr. Stadtmauer's] argument is based on the rule applied in Cincinnatti, New
> Orleans and Texas Pacific Railway Co. v. United States, where the taxpayer was
> permitted to deduct, rather than capitalize, expenses of less than $500 where such
> expenses did not distort reported income.  424 F.2d 563, 570-73 (Ct. Cl. 1970).
> While it is true that such a de minimus exception could apply in case such as
> Cincinnatti, New Orleans, where the expenses in question represent minuscule
> fractions of both the yearly operating income and the depreciation deduction reported
> by a taxpayer, this case is substantially different.  424 F.2d at 571.  The Tax Court
> has distinguished the principle announced in Cincinnatti, New Orleans in the case of
> Alacare Home Health Services Inc. v. Commissioner, limiting its application of the
> de minimus rule to circumstances in which de minimus expenses do not distort the
> reported income of the taxpayer.  81 T.C.M. (CCH) 1794 (Tax Ct. June 22, 2001).
> In Alacare, the Tax Court distinguished between deductions too small to distort the
> reported income of a taxpayer, such as a calculator costing $52.45, and the hundreds
> of thousands of dollars in deductions claimed by the taxpayer in that case, and found
> that the de minimus exception did not apply where it did not result in an accurate
> reflection of income.  Id.  This case presents similar issues to Alacare.   The
> Government alleged (and obtained some guilty verdicts concerning) a systematic plan
> by Stadtmauer and his co-conspirators to, inter alia, abuse the capitalization rules and
> file returns that were materially false as to deductions that should have been
> capitalized. (Red. Indictment at 5, 6, 13-16, 18-33, 35-36; Tr. at 24.83-86, 24.102,
> 24.115.) . . . While the proposed de minimus deductions here may do not in
> themselves rise to the level of those in Alacare, the wholesale nature of the
> deductions and the means in which they were planned indicates that they would
> clearly be in the nature of deductions that distort the income of the taxpayer, and thus
> beyond the scope of the de minimus rationale of Cincinnatti, New Orleans. 424 F.2d
> at 570-73.

United Stated v. Stadtmauer, No. 05–cr-249, 2008 U.S. Dist. LEXIS 84318, at * 31-33 (D.N.J.

Sept. 8, 2008).  Thus, in as much as this Court has previously found that Mr. Stadtmauer's de

minimus rule argument is without merit as it applies to the facts of this case and because it also

finds that the evidence related to these expenditures speaks for itself, the Court finds that, as to

these items, a fact-intensive inquiry is not necessary and the evidence overwhelmingly

demonstrated that these expenses were systematically deducted in full.  Therefore, this Court

finds that the Government has proven the $1,862,036 of deductions related to new asset

purchases by a preponderance of the evidence.

      *b)*     *Building Improvements*

     Unlike the new asset purchases, which speak for themselves, this Court has previously

held that "[t]he capital expenditures contested [here] . . . were consistently of a sort requiring

careful factual analysis in each instance" Id. at * 27.  Thus, determining whether something is an

improvement versus a repair requires an inquiry of greater specificity.  Mr. Stadtmauer argues

that "[t]he Government has never engaged in the requisite careful factual analysis with respect to

each item it claims was wrongly deducted as an expense instead of being capitalized." (Def.'s

Mem., at 76.)   Mr. Stadtmauer points out that the "[G]overnment called only five witnesses . . .

four of these five contractors testified that certain parts of their work definitely constituted

repairs." (Id. at 76-77.)  For example, Government Exhibit 5212 classifies a $14,651 payment to

Colletti Construction for "new baths & window" as an improper "capital/depreciable" item,

referencing Exhibit 3140.  Exhibit 3140 is an invoice for $1,968 for the installation of a "new

window at rear 2nd floor bedroom."  The contractor who replaced the window testified that he

replaced one window because of a water problem that was causing "rot and fungus beneath the

windowsill." (Trial Tr. 14.66-67.)  At trial, Agent Grant testified:

> [Gov't]: If one window is replaced, is the whole building improved?
> [Agent Grant]: I don't believe so.
> [Gov't]: Doesn't one replacement window have to be capitalized?
> [Agent Grant]: I don't believe so.

(Trial Tr. 26.139.)   Additionally, Mr. Stadtmauer points to numerous examples of Agent Grant's

testimony to support his argument that she did not engage in the appropriate level of inquiry.   For

example, Agent Grant testified:

> [Gov't]: How did you determine [that] this item should be included on your
> summary chart?
> [Agent Grant]: I reviewed the general ledger, and *based on the amount of money*,
> determined that it should be capitalized. . . .
> (Trial Tr. 24.104 (emphasis added).)
> * * *
> [Gov't]: This chart [for 1997 for Oakwood Apartments] looks a little different
> from the ones from other years that we looked at.  Is that right?
> [Agent Grant]: Correct.
> [Gov't]: What is that?
> [Agent Grant]: I didn't have any documentation from the Kushner Companies or
> from third parties regarding these items.
> [Gov't]: So how did you determine what to include on this chart?
> [Agent Grant]: In the building section, basically I relied on the description that
> was in the general ledger . . . .
> (Trial Tr. 24.113.)

Therefore, while it maybe that some portion of the Government's number represents improper

deductions, the Government has, in this Court's opinion, failed to prove any particular portion of

these type of deductions by the required preponderance of the evidence.

    2.   <u>Additional Distributions</u>

    Agent Grant's charts show $1,144,140 of deductions related to additional distributions.

These expenses relate to items where one partnership paid for an expense of another partnership;

the parties also refer to this category as non-property related deductions.  Mr. Stadtmauer does

not appear to contest that these payments occurred in the manner alleged, rather, he argues that

they were properly deducted.  Although the tax argument is different, his approach with these expenses appears to be similar to the approach he takes regarding new assets purchases.  In essence he argues–sure, in general, as a category of expenses, the Kushner Companies did what the Government alleges, but the Government has the tax law wrong, the expenses were fully deductible.  In fact, at the sentencing hearing, Mr. Fink was unwilling to concede that, as a general rule, if an item that is proven to be related to Partnership A was actually paid for and expensed by Partnership B that Partnership B's expensing of the item was improper, and that, therefore, the expense was not properly deductible by either partnership.  Instead, he insisted that in this case all the items in this category were properly deducted.  In Menard, Inc. v. Commissioner, a case cited by Mr. Stadtmauer, the court stated that "[i]n general, a taxpayer who pays another taxpayer's business expenses may not treat those payments as ordinary and necessary expenses incurred in the payor's business." Nos. 673-02, 674-02, 2004 WL 2066599, at * 24 (U.S. Tax Ct. Sept. 16, 2004).  It is this general rule that serves as the starting point for the Court's analysis of these items.

   a)    *Abandoned Ventures*

   Of the Government's total for the category of additional distributions, $446,782 is related to abandoned ventures.  These deductions relate to expenses paid for by various partnerships for new business ventures that were subsequently abandoned.  Business entities are permitted to deduct "costs associated with specific transactions that are first pursued then later abandoned." In re Federated Dep't Stores, 135 B.R. 950, 959 (Bankr. S.D. Oh. 1992) (citing 26 U.S.C. § 165(a) and Sibley, Lindsay & Curr Co. v. Comm'r, 15 T.C. 106 (1950)).  The issue here is not whether the projects were actually abandoned or whether the expenses were actually paid, both

14

parties appear to agree that they were.  Rather, the issue is whether the deduction was proper for the partnership that actually took it.

Mr. Stadtmauer argues that the Government has not proven who the partners in the new ventures were going to be, that testimony showed that only Mr. Kushner could have made that determination, and that the allocation of expenses to the various partnerships on the partnership returns is evidence of who the intended partners were.  (See Trial Tr. 8.52, 23.43-44, and 26.8.) Basically he argues that unless the Government can prove that the partnership that took the deduction was not an intended partner in the abandoned ventures, then the deduction must be allowed.  This Court disagrees.  If Mr. Stadtmauer's argument were to be accepted, any group of separate entities controlled by the same person could allocate expenses in any way they saw fit and then post hoc decide who to designate as intended partners in order to make the deductions proper.  This clearly would be an unreasonable approach.  Instead, this Court finds that what is required of the Government is simply to prove that at the time the deductions were taken it is more likely than not that the expenses did not relate to the business of the partnership that took the deduction.

The Government argues that the evidence at trial overwhelming indicated that the venture fees were assigned to certain partnerships not because they in fact were going to be partners in the new venture but instead because they were the entities that had sufficient cash to pay the bills.  For example, the Government points to the testimony of Mr. Bentzlin, CFO of the Kushner Companies from 1994 to 1999, where he stated that he "was told to allocate [a new venture bill] to the big jobs, and do so by four o'clock that day." (Trial Tr. 5.128.)  Mr Zecher, Executive Vice-President of the Kushner Companies, also testified:

15

> [Gov't]: What are "dead land deals?"
> [Mr. Zecher]: Those were deals that they hoped to purchase, but didn't end up acquiring for whatever reason.
> [Gov't]: And what is listed next to that?
> [Mr. Zecher]: $1,718.
> [Gov't]: What is next to that?
> [Mr. Zecher]: In my handwriting it says, "loose".
> [Gov't]: What does that refer to?
> [Mr. Zecher]: That means I am told to just pay it out of any other entity that has cash flow.

(Trial Tr. 16.20; see also, e.g., Gov't Ex. 3448 (noting that the Project Rent bill was to be divided evenly among five partnerships).)  Having reviewed the record and the evidence, this Court agrees with the Government that the evidence overwhelmingly demonstrates that the new venture expenses were being allocated based on ability to pay, not based on a partnership's own business interest in the new venture.   Therefore, this Court finds that the Government has proven that the deductions related to abandoned ventures were improperly deducted.

   *b)*      *Other Non-Property Related Items*

   The Government has broken the remaining expenses into those related to 26 Columbia Turnpike (the Kushner Companies headquarters), $366,811, and expenses related to political fundraisers and Norcrown Bank, $176,747.  With the abandoned venture expenses, these subcategories total $990,340.  Presumably, therefore, the remaining $153,800 relates to the miscellaneous expenses discussed at the sentencing hearing and at trial, such as repairs to the property of one partnership paid for by another partnership.  Although these other non-property items can be broken down into these smaller sub-categories, Mr. Stadtmauer's basic argument for all of them is the same–one partnership paid for the expense of another partnership in order to promote its own business interests and as such the expenses were properly deducted.  "A

16

partnership may . . . . pay for another partnership's expenses, and then deduct those expenses as

business expenses, if (i) the . . . primary motive for paying the expenses is to promote the

partnership's own business; and (ii) the expenses are ordinary and necessary." (Def.'s Mem,. at

70 n.27 (citing Lohrke v. Comm'r, 48 T.C. 679, 684-85 (1967).)  Mr. Stadtmauer argues that all

of the other non-property deductions fit within this exception.  The Government disagrees,

pointing to what this Court finds is the substantial amount of evidence in the record showing that

the primary motive in deciding who paid the expenses was to allocate the expenses to the

partnerships who had the ability to pay.  For example, Mr. Bentzlin testified:

> [Mr. Bentzlin]: [T]he reason why [the expenses were] on this list is because the
> amounts in the right-hand column represent amounts that have to be paid for those
> entities, and the case was not available to pay it. . . . So each week these items would
> be on the agenda, and Charles Kushner would direct us how he wanted us to pay
> those bills.
> * * *
> [Mr. Bentzlin]: The Design Center was a facility being built and building where the
> headquarters were, and, again, that one didn't have cash to pay it.  So when it says
> lose, he was telling us to pay it out of another entity.
> * * *
> [Gov't]: When you said, "pay it out of another entity," did you create a record of that
> to offset the transaction later on in the year?
> [Mr. Bentzlin]: No.  Typically loose meant lose, not to be reimbursed from one entity
> to another.  Just pay it out of there and let it go.

(Trial Tr. 4.125-127; see also, e.g., Gov't Ex. 2178 (noting that $90,000 in bills for 26 Columbia

were to be "lost").)  Mr. Zecher testified:

> [Gov't]: [W]hen you were told to lose a bill, how did you determine what properties
> would – or what property or properties would pay for that bill?
> [Mr. Zecher]: Well, first of all, it had to be a property that had excess cash.  If it
> didn't have the case, you can't pay the bill.  So, you know, we would focus on the
> properties that had excess cash.

(Trial Tr. 14.103.)

17

Particularly with respect to 26 Columbia Turnpike, Mr. Stadtmauer argues that the expenses were paid by the various partnerships because they used the headquarter building. He notes, for example, that all building managers had offices there, all accounting was done there, and all meetings took place there. (See Trial Tr. 9.45-49, Mr. Bentzlin Cross.) The Government responds by noting that the partnerships paid a management fee to cover use of the building, that the expenses in question were not evenly paid, and most importantly, that the evidence, as noted above, demonstrated that regardless of any other motive, the primary motive in allocating the expenses was simply who could pay the bills. Thus, the Government argues that the narrow exception to the general rule that Mr. Stadtmauer relies on does not apply here.

For the political fundraiser expenses and the other miscellaneous expenses, Mr. Stadtmauer essentially makes a branding argument–the Kushner Companies are a well known name, a brand that has value in the marketplace, and therefore, public events benefit all the entities and problems with properties, such as a building in need of repair, affect all the entities. Thus, he argues, various partnerships paid expenses for other partnerships in protection of their own interests and to promote the Kushner name for their own benefit. As with the post hoc partner designation argument for the abandoned ventures, this line of argument, if accepted, would turn the tax laws on their head. Any large entity with a well-known market name could allocate expenses across entities at will. Mr. Stadmauer's argument provides no clear line that would limit such deductions. Nevertheless, aside from whether his branding argument or other secondary motive may have any merit, this Court finds that, on the evidence presented in this case, the Government has proven by a preponderance of the evidence that the *primary motive* for the allocation of these expenses was not to further the paying partnerships *own business* as

18

required for the exception to apply.  Therefore, this Court finds that the other non-property

related expenses also represent improper deductions.

      3.    <u>Charitable Contributions to Office Expense</u>

      The Government alleges $1,497,149 of improper deductions in this category.   At his plea

before this Court, Charles Kushner admitted to directing that $1,018,966 of charitable

contributions be fraudulently disguised as office expenses.[5]  (Kushner Plea Tr. 27.)   While these

numbers do not tie exactly to Agent Grant's charts presented at Mr. Stadtmauer's trial, they do

generally correspond to her numbers; her charts take into account additional information learned

by the Government between the time of Mr. Kushner's plea and Mr. Stadtmauer's trial.  This

Court finds that Mr. Kushner's plea allocution adequately corroborates Agent Grant's findings

with respect to these deductions and is proof by a preponderance of the evidence as to that

number.  The question, then, is whether the Government has adequately proven the remainder of

alleged deductions in this category, $478,183.

      Again, Mr. Stadtmauer claims that these expenses fit an exception to the general rule,

making them fully deductible by the partnerships.  He provides various declarations attesting to

the purpose of the donations, providing an inference that they were for the benefit of the paying

partnership.  The Government strongly objects to Mr. Stadtmauer's characterizations, arguing

that the donations were for the benefit of Mr. Kushner personally, not for the benefit of, for

example, a partnership whose business was renting apartments.  Each party takes individual

---

     [5] In Mr. Kushner's civil audit, the IRS made adjustments for $1,019,215 of improper
charitable contribution deductions.  This Court does not know why these numbers are different,
but uses the numbers from his plea allocution before this Court.  At his plea he admitted under
oath to specific amounts of fraudulent deductions by partnership and by year.  These amounts
totalled $1,018,966.

expenses and makes individual fact-based arguments. These types of expenses, thus, are of the type where the Government's summary approach makes proof of a specific amount difficult. However, for the reasons noted in footnote 8, _infra_, this Court finds it unnecessary to determine if the Government has in fact met its burden for this remaining amount of charitable deductions; for the reasons set forth in footnote 8, inclusion or non-inclusion of these items will not affect the outcome.

    4.    <u>Gifts & Entertainment</u>

The Government asserts that there were $273,632 of improper gifts & entertainment ("G&E") expenses, made up of $117,006 related to G&E expenses attributable to American Express ("AMEX") payments and the remaining $156,626 attributable to non-AMEX payments. As noted above, Agent Grant testified at trial that "there might be some expenses in the American Express _that might be fully deductible_, and therefore allowing other expenses at more than that their allowance would compensate for that." (Trial Tr. 24.132 (emphasis added).)   At the sentencing hearing, Ms. Honig, for the Government, stated: "The American Express . . . your Honor, I don't think you need to decide that for sentencing.  You take out the AMEX charges, a tiny, tiny fraction . . . It doesn't change [the guideline] at all." (Sentencing Hearing Tr. 112-113.)  Based on Agent Grant's testimony and this concession, this Court finds that the Government has not met its burden for this amount by a preponderance of the evidence.

As was the case with the charitable deductions, testimony relating to the remaining G&E expenses was conflicting and inconsistent, with very fact based attacks on individual expenses, making the Government's summary approach less than desirable.  However, also for the reasons noted in footnote 8, _infra_, this Court finds it unnecessary to determine if the Government has met

its burden for the non-AMEX G&E expenses; again, inclusion or non-inclusion of these items will not affect the outcome.

In summary, this Court finds that the Government has proven by a preponderance of the evidence that the following deductions were improper.

|  | Government Allegation | Court Findings |
| --- | --- | --- |
| Capital/Depreciable Items<br>Less: Depreciation Allowed<br>Net Capital/Depreciable Items | $4,106,237<br>(689,619)<br>$3,416,618 | $1,862,036 |
| Additional Distributions | $1,144,140 | $1,144,140 |
| Contributions to Office Expense | $1,497,149 | $1,018,966 |
| Gifts & Entertainment Expense (50%) | $  273,632 |  |
| **Total Alleged Improper Deductions** | **$6,331,539** | **$4,025, 142** |

### C.    Calculating the Amount of Tax Loss

The parties next argue over whether the Guideline's 28% presumptive amount should be used or whether the tax loss calculation presented by Mr. Stadtmauer from his rerunning of partners' tax returns is a more accurate determination that should be used. The Government argues that the Guidelines provide that the 28% shall be used unless a more accurate determination can be made. And it further argues that the hypothetical tax return reruns provided by Mr. Stadtmauer are too speculative and not more accurate than using the 28% rate. Mr. Stadtmauer argues that the Government's use of the presumptive rate grossly overstates the tax loss. Both parties argue as if one of these approaches must be chosen by this Court. The Guidelines provide that

> [i]n determining the tax loss attributable to the offense, the court should use as many
> methods set forth in subsection (c) and this commentary as are necessary given the
> circumstances of the particular case. If none of the methods of determining the tax
> loss set forth fit the circumstances of the particular case, the court should use any
> method of determining the tax loss that appears appropriate to reasonably calculate
> the loss that would have resulted had the offense been successfully completed.

USSG §2T1.1, Application Note 1. Thus, "[a] sentencing court is permitted to take 'a reasonable estimate based on the available facts' where the exact amount of tax loss may be uncertain." Gricco, 277 F.3d at 356 (quoting Application Note 1); see also United States v. Harvey, 996 F2d 919, 921-22 (7th Cir.1993) (finding that the Government's method overstated the loss and the defendant's method understated loss, and choosing a third method as the more reasonable approach).

The Government argues in its brief that "the Guidelines are not based on the government's actual out-of pocket loss at the end of the day, but rather, on a reasonable estimate of the loss originally intended by those criminally responsible." (Gov't Rep., at 13-14.) The Government thus argues that the 28% presumptive rate is *the* reasonable estimate in most cases. This Court agrees that "the Guidelines properly focus on the determination of a reasonable estimate of the intended tax loss," (Gov't Rep., at 14), but disagrees with the stark dichotomy that the Government attempts to create. It is clear that a showing of an actual tax loss *owed* to the IRS by a defendant at the time of sentencing is not the measure of tax loss under the Guidelines. See, e.g., United States v. Mathis, 980 F.2d 496 (8th Cir. 1992) (holding that payment of the deficient taxes does not affect the tax loss calculation). But, saying that a defendant should not get the benefit of payments that he makes before sentencing is not the same as saying that in some cases it may be possible to calculate the actual tax loss *intended*. That is

22

what Mr. Stadtmauer argues has done.

Courts differ over whether the concept of actual tax loss intended includes giving a credit for deductions that would have been allowed had the deduction been properly reported.  Mr. Stadtmauer argues that "credit must be given for any deduction that could have been taken by a partnership if it had been properly allocated and reported."  (Def.'s Mem., at 71  (citing United States v. Martinez-Rios, 143 F.3d 662, 671 (2d Cir. 1998).)   The Government cites cases saying that the tax loss calculation need not to take into account unclaimed deductions.  See United States v. Delfino, 510 F.3d 468, 473 (4th Cir. 2007) (holding that the tax loss is to be calculated on "the amount by which [the defendants] underreported (or failed to report) their taxable income," without taking into account a calculation of deductions); United States v. Chavin, 316 F.3d 666, 679 (7th Cir. 2002) ("[W]e simply cannot read the phrase 'a more accurate determination' to allow for consideration of unclaimed deductions."); United States v. Spencer, 178 F.3d 1365, 1368 (10th Cir. 1999) (holding that in computing tax loss "we are merely assessing the tax loss resulting from the manner in which the defendant chose to complete his income tax returns"); see also United States v. Phelps, 478 F.3d 680, 682 (5th Cir 2007) (holding that "reference to other unrelated mistakes on the return such as unclaimed deductions tells us nothing about the amount of loss to the Government that his scheme intended to create."); United States v. Blevins, 542 F.3d 1200, 1203 (8th Cir. 2008) (referring to the Delfino, Chavin, Spencer, and Phelps decisions, and holding that "[t]aking into account unclaimed tax benefits wholly unrelated to the offense of conviction is contrary to the plain meaning and definition of tax loss in [the USSG].").   But see United States v. Gordon, 291 F.3d 181, 187 (2d Cir. 2002) (following Martinez-Rios and holding that offsetting deductions related to the charged conduct should be

considered, but finding that under the facts of the case, the asserted deductions were too speculative).

To the extent that some of these cases hold that intended tax loss is appropriately captured by looking only at the deductions as filed, this Court disagrees. *Intended* tax loss surely includes consideration of any deduction directly related to the crime–if a person chose to fully expense a business meal rather than subjecting it to the 50% disallowance limit, the loss he intended is not the tax effect related to the full expense, but rather the extra tax benefit he received from deducting the additional 50% over what he would otherwise be allowed. This appears to be the position of the Second Circuit. Saying that, all of the cases above clearly stand for the proposition that unclaimed deductions unrelated to the criminal activity or deductions that are too speculative or based on hypothetical, unproven, "ifs" should not be taken into account. Although the Government seems to argue otherwise in its brief, its approach to calculating tax loss appears to be in line with this Court's position; the Government gave a 50% offsetting deduction for improper G&E expenses taken and it gave an offsetting deduction for capital expenditures. Therefore, this Court assumes that the Government actually agrees with the Second Circuit's approach in Gordon wherein direct deductions are credited but unrelated or speculative deductions are not. With this in mind, the Court will examine whether the 28% presumptive rate should be used or whether Mr. Stadtmauer's hypothetical returns provide a more accurate determination of tax loss.

1.    Hypothetical Returns

Mr. Stadtmauer provided hypothetical return summaries prepared by Stuart Kotler, a CPA. Mr. Kotler reran the originally filed returns for over 60% of the partners under four

different hypothetical scenarios. (See Def.'s Mem., at 21.) Two of the scenarios excluded

amounts related to his acquittals. For the reasons discussed above, this Court rejects those

scenarios. One of the other scenarios used the Government's numbers, but also corrected for

errors on the original returns, in particular an error in originally computing Mr. Kushner's

alternative minimum tax adjustment (an adjustment unrelated to the charges here), producing a

tax loss of $0. This Court rejects this scenario. As discussed above, while it may be appropriate

to take into account possible deductions related to the charges in question, unrelated adjustments

should not be taken into account. The other scenario, which this Court considers in this section,

adjusted the returns using 100% of the Government's alleged deductions, without any additional

adjustments. This scenario produced a tax loss of $88,141 for the reran returns or a total

proposed tax loss of $142,488 when extrapolated out to estimate the effect for all returns at issue.

Mr. Stadtmauer does not claim that the hypothetical rerun is perfect, but rather that it

provides a better estimate than the 28% rate, and that it demonstrates that the Government's

calculation grossly overstates Mr. Stadtmauer's tax loss. The Government argues that Mr.

Stadtmauer's hypothetical rerun is too speculative. It points to Gricco for the proposition that a

Court does not need to engage in this type of detailed recreation. This Court agrees, based on its

previous finding that a "district court is not required to pore through the tax returns of all of the

participants . . . to determine the exact amount of unreported income." United States v.

Stadtmauer, 05-cr-249, 2008 U.S. Dist. LEXIS 92147, at * 10 (D.N.J. Nov. 13, 2008) (quoting

Gricco, 277 F.3d at 356). However, saying that a court is not required to engage in this type of

detailed recreation says nothing about how a court should treat such recreations when actually

prepared and provided by a defendant. At the sentencing hearing, the Government did admit that

25

in some cases recreations may be appropriate, for example when the adjustments affect one return and are straight forward. But, the Government argues that the circumstances here are very different–the issues are more complex, greater in scope, and affect numerous returns. Mr. Kotler prepared hypothetical returns using four scenarios for eight partnerships[6] flowing through to nine taxpayers for five years, making numerous adjustments on all of them. Mr. Stadtmauer argues that the recalculations were no more difficult than any other recreation. This Court does not doubt that the actual recreation of the returns by Mr. Kotler was not difficult in the sense of plugging the Government's pre-defined numbers and pre-defined treatment into a tax program. But, this is not the whole issue. The question is whether, as tax return recreations involve more and more taxpayers over numerous years with potential tax effects extending beyond the years of the reruns, they become too hypothetical to provide a reasonable estimate of the intended tax loss, especially if some other method is available. This Court answers this question in the affirmative under the facts in this case.

The Court finds this to be particularly true in light of the fact that Mr. Fink acknowledged at the sentencing hearing that the hypothetical calculations did not account for any suspended partnership losses. In his brief Mr. Stadtmauer notes that in some cases, on the original returns, the taxpayers were not able to take advantage of the improper deductions because the extra deduction only generated higher passive losses, which were not deductible. The Government argues that while they were not currently deductible, they were not lost, they were merely suspended until some point in the future when they could be utilized. Mr. Fink's position seems

---

[6] The Government's numbers include alleged improper deductions from nine partnerships; the deductions related to Westminister (approximately $112,000 in charitable deductions) do not appear to be included in the hypothetical reruns.

to be that the suspended losses have no effect on the recalculation of tax loss. This Court disagrees.

The way that the recreated tax loss is presented by Mr. Kotler is by showing a number representing the "Income Tax originally reported on returns as filed," comparing it to "Revised tax using 100% of gov't disallowances to adjust returns as originally filed," and then taking the difference between these two numbers as the "tax loss." In other words:

| As originally filed | As Adjusted | Difference = Tax loss |
|---|---|---|
| $3,191,645 | $3,279,786 | $88,141[7] |

(Def.'s Decs., Ex. A., Dec. of Stuart Kotler.)  But, the real effect of the improper deductions as originally filed was the income tax as originally filed adjusted for the estimated future benefit from the suspended losses. Such an adjustment likely would make the starting number for comparison lower (i.e. the suspended passive losses would reduce income tax owed at some point). When compared to the as adjusted amount, then, the "tax loss" difference would be greater than currently estimated. Thus, this Court finds that in addition to being too speculative as a general matter, failure to account for the suspended losses means that the hypothetical returns likely understate the intended tax loss. Saying that, this Court also finds that the radical difference between these reruns, which do make a significant effort to quantify the real effect of different types of deductions, and the Government's tax loss number using the flat 28% across the board, highlights that the Government's approach is also not reasonable in light of the particular circumstances of this case.

---

[7] For the 60% of returns available.

27

2.    Estimating the Tax Loss

a)    *Capital/Depreciable Items*

In its opening statement at trial, the Government stated:

> Now, I expect that you may hear during the course of this trial that the difference between capitalizing an expenditure and expensing it – in other words, deducting it in full - is just a timing issue, and that is absolutely true. You still get to deduct your capital expenditures, you just have to do it over time.
> But you are also going to hear that this timing issue is no small thing because of something called the time value of money. . . .

(Trial Tr. 4.23.) This position was restated at a sidebar during the trial, (Id. at 25.167), and taken

in their reply brief, (Gov't Rep., at 22-23.) Thus, both parties agree that the issue with this

category of deductions is one of timing; the expenses were deductible in full, just not in full in

the year taken by the partnerships. Mr. Stadtmauer argues that since the issue is only one of

timing there is no tax loss associated with these deductions. The Government disagrees, arguing

that there is at a least a loss due to the time value of money. However, the Government does not

argue that the loss is the time value of money, rather the Government argues that because there is

some loss due to the time value of money the 28% presumptive rate should be used. This Court

agrees with the Government that the time value of money should be considered as a tax loss, but

disagrees that using the 28% rate is appropriate; the 28% rate does not "fit the circumstances" for

these deductions. See USSG 2T1.1, Application Note 1.

The Court recognizes, and the Government conceded at the sentencing hearing, that as a

general matter, tax loss under the Guidelines for the crimes at issue here does not include interest

and penalties. Id. The Court also recognizes that interest calculations are meant to account for

the time value of money, so arguably any interest based calculation should not be included under

the Guidelines.  But, the Court also finds that recognizing a time value of money effect for these deductions is completely different than the general case of calculating and adding interest, as addressed in Application Note 1.  Under § 2T1.1(c), "the tax loss is the amount of loss that was the object of the offense."  Here, the purpose of taking the deductions in full in the year incurred was to receive the time value of money benefit from paying less taxes now rather than spread over time; it was not merely some ancillary benefit to the primary object of avoiding taxes by taking a deduction that was not permissible at all, the time value of money benefit was *the object* of the offense.

The question, then, is what is a reasonable way to estimate this loss.  As noted above, to accept the presumptive 28% rate as the Government argues would be unfair and drastically overstate the tax loss.  The Court finds that the most reasonable way to account for this loss is by using the Government's own method for compensating itself for the time value of money related to underpayments of tax.  Interest on underpayments is calculated by the IRS pursuant to 26 U.S.C. § 6621(a)(2).  This rate is determined quarterly.  Id. at § 6621(b).  For the years 1997 to 2001, the IRS rate for non-corporate underpayments varied between 7% and 9%, with the rate declining in the years after 2001.  See Rev. Rul. 2008-54.  This Court finds that using a rate of 8%, a rate in the middle of the range, is reasonable.  This approach is not perfect.  It does not account for compounding, but it also does not account for the exact timing of the deductions.  However, exact precision is not required.  This Court finds that the other methods suggested either understate or overstate the intended loss and that this method is the most fair and reasonable estimate of the loss intended for these items.  See Gricco, 277 F.3d at 356.

29

       *b)*     *Additional Distributions*

     Mr. Stadtmauer argues that, even if improperly deducted, the Court should take into account that these expenses were actually paid and would have been ordinary business expenses of the entity to which they were related had they actually been paid by that entity. He argues that "[a]n item paid for by one partnership for another would . . . in many instances have been deductible by the beneficiary partnership if paid by that partnership, so deduction of this item by a different partnership did not result in tax loss." (Def.'s Mem., at 68.) This Court disagrees. The evidence clearly showed that the primary motive for how these expenses were allocated was specifically to avoid the beneficiary entity from having to bear the expense burden. This is the type of hypothetical "if" deduction that is too speculative, and actually contrary to the evidence, to be used to offset any loss. Because adjusting for these types of deductions merely adds to income, making them the typical false deduction that is wholly non-deductible, this Court finds that application of the 28% rate for this category of improper deductions is appropriate.

       *c)*     *Charitable Contributions to Office Expense*

     Unlike G&E expenses and capital/depreciable items, the Government did not give Mr. Stadtmauer any offsetting deduction related to charitable deductions. They acknowledge that the funds were paid to bona fide charities. (See Trial Tr. 4.17-18.) They also acknowledged that in general, such expenses would flow through and be deductible on individual partner returns. (See id.; Gov't Rep., at 10.) But, they argue that most of the donations were for the benefit of Mr. Kushner and he would not have been able to take any deduction on his return because he had a negative adjusted gross income. Mr. Stadtmauer, on the other hand, argues that as the partnerships were actually operating, the deductions would have flowed through proportionately

to the various partners and, according to the return reruns, they would have been deductible by some partners. For example, at the sentencing hearing, Mr. Fink stated that Mr. Stadtmauer would have been able to use all of his portion of the flow through deductions. (Sentencing Hearing Tr. 79.) As the Court understands it, the Government responds with its own hypothetical if. The Government argues that had the deductions actually run through the returns to the individual partners, the partners would have been outraged and stopped the payment of charitable donations from the partnerships, so that future contributions allocable to all partners would not have been made. Again, this Court finds such tenuous hypothetical arguments unpersuasive.

The Court finds that, as a general matter, allowing an offset for the allowable part of charitable deductions is no different than allowing an offset for the allowable portion of G&E expenses. Thus, the question is whether there is any way to quantify a reasonable offset. Given that the evidence, particularly from the rerun returns, merely shows that some, unidentified amount, of contributions would have been deductible, this Court finds that the choice of any offset would be arbitrary. However, because this Court is persuaded that some portion would have been allowable, use of the 28% rate on the full amount of deductions in this category also seems unreasonable as it will clearly overstate the intended tax loss. Rather, the Court finds that a more reasonable approach is to use the amount of tax computed as part of Mr. Kushner's audit.

While, as a general rule, a defendant's own actual tax owed may not be an appropriate measure of tax loss, this Court finds that under the circumstances of this case and given the lack of a better measure, that Mr. Kushner's tax settlement is useful for these deductions. The improper deductions added back to income for purposes of Mr. Kushner's audit represent the

31

amount of false deductions at issue here. Additionally, the Government in the audit treated all

the deductions as if they had flowed through only Mr. Kushner's returns, as the Government

argues here was most appropriate. Thus, this Court finds that using the $119,595 of calculated

tax liability from Mr. Kushner's audit is the most reasonable estimate of loss related to the

improper charitable deductions.

Based on the foregoing, this Court finds that the tax loss for sentencing purposes is

$588,917. Under the Guidelines this amount of loss equates to a base offense level of 20. The

following chart summarizes the Court's calculation of tax loss.

|  | Improper Deductions | Tax Loss Rate | Tax Loss |
|---|---|---|---|
| Capital/Depreciable Items | $1,862,036 | 8% | $148,963 |
| Additional Distributions | $1,144,140 | 28% | $320,359 |
| Contributions to Office Expense | $1,018,966 | Other | $119,595 |
| **Total Tax Loss** |  |  | **$588,917**[8] |

## II.    ENHANCEMENTS

### A.    Aggravating Role

USSG § 3B1.1 states:

Based on the defendant's role in the offense, increase the offense level as follows:

---

[8] Even if this Court had found that the Government had proven its entire amount of alleged improper deductions, which it has not so found, the USSG sentencing range would be unchanged. Applying the Court's tax loss method to the Government's full alleged improper deduction number (without any offset for depreciation allowed) and calculating any tax loss on the non-Kushner charitable deductions and G&E deductions at 28% still only produces a tax loss of $978,961. This amount is within the Guidelines range ultimately found by this Court ($400,000 to $1,000,000).

(a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.
(b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.
(c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

The PSR does not recommend any enhancement for role in the offense, stating that Mr. Stadtmauer "is viewed as equally culpable with Plotkin in the conspiracy, and their respective individual accountability can be addressed when determining an appropriate sentence within the range." (PSR, at ¶ 167.)  The Government disagrees and argues that the requirements for a three point enhancement clearly have been met.  They point to the fact that four people have been convicted of participating in the conspiracy and three more have been convicted of participating in the offense conduct; therefore, they assert it is clear that the criminal activity involved at least 5 people.  They also argue that the record is clear that Mr. Stadtmauer supervised and managed at least one participant.

Mr. Stadtmauer argues, on the other hand, that there is a difference between being a manager or supervisor in a business and managing or supervising the criminal activity.  So, while he admits that he had a supervisory and management role at the Kushner Companies, he argues that the evidence does not prove a supervising or managing role in the criminal activity.  He points to the fact that the jury was given a willful blindness instruction at trial.  This Court finds this argument unpersuasive.  Ample evidence exists to support a finding that Mr. Stadtmauer had an active and managing role in the criminal activity.  For example, Mr. Bentzlin testified that employees would "[g]o to [Mr. Stadtmauer] with the bills [to be lost], and he would tell them what entities to pay them out of, so the bills could be paid." (Trial Tr. 4.129.)  Mr. Lefkowitz, a

33

Kushner Company CFO, testified that at the Tuesday funding meetings, that the person saying

yes or no to something was "[t]ypically Charlie, but it might be Jeff, or it might be [Mr.

Stadtmauer]." (Trial Tr. 11.89.)  Mr. Zecher testified:

> [Gov't]: How long was Mr. Stadtmauer involved in the day-to-day running of
> Kushner Companies?
> [Mr. Zecher]: In the five plus years I was there, there was no one more involved than
> [Mr. Stadtmauer]. . . . He was involved in everything. . . . There was nothing [Mr.
> Stadtmauer] didn't see fit to get involved with in property management, whether that
> was Tuesday morning meeting or at the Thursday morning meeting . . . I mean [Mr.
> Stadtmauer knew everything.

(Trial Tr. 15.82.)  Therefore, a three point enhancement is appropriate.

### B.    Special Skill

The Government originally argued for an additional two point enhancement for use of a

special skill under USSG §3B1.3 because Mr. Stadtmauer is a CPA and attorney.  However, at

the sentencing hearing the Government conceded that under the Guidelines, if the § 3B1.3

"adjustment is based solely on the use of a special skill, it may not be employed in addition to an

adjustment under § 3B1.1 (Aggravating Role)."  Therefore, because this Court finds that a three

point enhancement for Aggravating Role is appropriate, there can be no additional adjustment for

use of a special skill.[9]

## III.    CONCLUSION

For the reasons set forth above, this Court finds that the applicable USSG offense level

for Mr. Stadtmauer is 23.  This offense level was calculated as follows:

---

[9]The Court notes, however, that even if an adjustment was permitted under § 3B1.3, no
adjustment is warranted under the facts of this case.  Although Mr. Stadtmauer possessed special
skills, the evidence does not support a finding that he used those skills in a manner that
significantly facilitated the commission or concealment of the crime.

- Base offense level: 20 (pursuant to USSG § 2T4.1 with a tax loss of between $400,000 and $1,000,000)
- Adjustment for Role in the Offense, § 3B1.1 Aggravating Role: +3
- Adjustment for Role in the Offense, § 3B1.3 Use of a Special Skill: 0

An offense level of 23 combined with Mr. Stadtmauer's criminal history category of I results in a USSG recommended sentencing range of 46-57 months. This range will be the starting point for the hearing on February 11, 2009, wherein this Court will hear additional argument regarding the appropriate sentence for Mr. Stadtmauer and will render its final sentencing determination.


DATED: February 9, 2009

Jose L. Linares
United States District Judge

35